IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

KYLER DAKOTA SHAW,

            Plaintiff,

     v.

HEIDI STEWARD, JEREMY NOFZIGER, BOB CULP, DAVID PEDRO, HEATHER NEVIL, ARIADNA PUENTE-GOMEZ, RODNEY CAREY, TRAVIS DRAKE, NOAH VAN WEICHEL, and DAVID JOHNSON,[1]

            Defendants.

Case No.: 2:23-cv-00410-AN

OPINION AND ORDER

Self-represented plaintiff Kyler Dakota Shaw brings this 42 U.S.C. § 1983 action against defendants Heidi Steward ("Steward"), Jeremy Nofziger ("Nofziger"), Ben Culp ("Culp"), David Pedro ("Pedro"), Heather Nevil ("Nevil"), Ariadna Puente-Gomez ("Puente-Gomez"), Rodney Carey ("Carey"), Travis Drake ("Drake"), Noah Van Weichel ("Van Weichel"), and David Johnson ("Johnson"), alleging violation of his Eighth and Fourteenth Amendment rights. On August 14, 2024, defendants filed a Motion for Summary Judgment, ECF [50]. On August 25, 2024, plaintiff filed a "Motion to Default," ECF [61], which the Court construes as a motion for order of default. For the following reasons, defendants' motion is GRANTED, and plaintiff's motion is DENIED.

## LEGAL STANDARD

**A.    Summary Judgment**

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). When deciding a

---

[1] The Court notes that several of defendants' names are spelled incorrectly on the docket and uses the correct spelling, taken from defendants' filings, in this Opinion and Order. *See* Defs. Answer to First Am. Compl., ECF [26], at ¶¶ 1-2, 4, 6, 8-10 (indicating proper spelling for defendants Heidi Steward, Bob Culp, Ariadna Puente-Gomez, Rodney Carey, Travis Drake, Noah Van Wechel, and David Johnson).

motion for summary judgment, the court construes the evidence in the light most favorable to the non-moving party. *See Barlow v. Ground*, 943 F.2d 1132, 1135 (9th Cir. 1991). However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphases omitted). The substantive law determines which facts are material. *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party has the initial burden of informing the court of the basis for its motion and identifying the portions of the pleadings and the record that it believes demonstrate the absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof at trial, the moving party need not produce evidence negating or disproving every essential element of the non-moving party's case. *Id.* at 325. Instead, the moving party need only prove that there is an absence of evidence to support the non-moving party's case. *Id.*; *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). If the moving party sustains its burden, the non-moving party must then show that there is a genuine issue of material fact that must be resolved at trial. *Celotex*, 477 U.S. at 324. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]" *Anderson*, 477 U.S. at 255.

**B.    Motion for Order of Default**

A court is required to enter a party's default when that party is one "against whom a judgment for affirmative is sought" and "who has failed to plead or otherwise defend," and where "that failure is shown by affidavit or otherwise." Fed. R. Civ. P. 55(a).

**C.    Self-Represented Litigants**

Pleadings filed by self-represented litigants "are held to a less stringent standard than those drafted by lawyers." *Graves v. Nw. Priority Credit Union*, No. 3:20-cv-00770-JR, 2020 WL 8085140, at

*2 (D. Or. Dec. 12, 2020) (citing *Haines v. Kerner*, 404 U.S. 519, 520 (1972)).  "In cases involving a [self-represented] plaintiff, the court construes the pleadings liberally and affords the plaintiff the benefit of any doubt."  *Kali v. Bulk Handling Sys.*, No. 6:18-cv-02010-AA, 2019 WL 1810966, at *4 (D. Or. Apr. 23, 2019) (citing *Wolfe v. Strankman*, 392 F.3d 358, 392 (9th Cir. 2004)).

## BACKGROUND

### A.    Factual Background

Plaintiff is an adult in custody ("AIC") at Eastern Oregon Correctional Institution ("EOCI").  Decl. of Nina Sobotta Supp. Defs. Mot. for Summ. J. ("Sobotta Decl."), ECF [51], ¶ 4.  Plaintiff brings this action against ten employees of the Oregon Department of Corrections ("ODOC"): Steward, ODOC's director; Nofziger, ODOC's assistant inspector general; Culp, ODOC's central trust manager; Pedro, EOCI's acting superintendent; Nevil, a hearings officer at EOCI; Puente-Gomez, a dental assistant at EOCI; Carey, a correctional lieutenant at EOCI; and Drake, Van Weichel, and Johnson, all correctional officers at EOCI.  *See* Compl., ECF [2]; Sobotta Decl. ¶ 5.  The action arises from punishment that plaintiff received following an altercation that took place at EOCI between plaintiff and another AIC named Justin Sennert ("Sennert").

### 1.    *Defendants' Factual Assertions*

Defendants set forth the following facts: on April 28, 2022, Johnson saw plaintiff being pushed out of Sennert's cell during telephone sign-up.  Defs. Mot. for Summ. J., ECF [50], at 5; Decl. of Heather Nevil Supp. Defs. Mot. for Summ. J. ("Nevil Decl."), ECF [52], ¶ 14 & Ex. 2 at 4, 26.  Johnson saw plaintiff re-enter the cell and then be pushed backwards again.  Nevil Decl., Ex. 2 at 4.  Johnson began to move toward the cell, where he saw plaintiff and Sennert "throw closed fisted punches at each others [*sic*] head and shoulder area," and yelled, "stop fighting, stop fighting," as he got closer.  *Id.*  Plaintiff and Sennert stopped fighting when Johnson threatened to use pepper spray, but plaintiff then started to fight again.  *Id.*  Video evidence captured the altercation.[2]  *Id.* at ¶ 15 & Ex. 2 at 4.  Johnson submitted a

---

[2] This video was provided to the Court *in camera*, under seal.  Nevil Decl. ¶ 16; Exs. 3 & 4 to Nevil Decl., ECF [59].

misconduct report regarding the altercation that day, and then, upon review of the video and to ensure consistency with the same, resubmitted the misconduct report on May 5, 2022. *See id.* at Ex. 2.

Nevil opened a disciplinary hearing regarding the altercation on May 5, 2022; dismissed the disciplinary hearing without prejudice and with leave to refile to allow Johnson to review the video and resubmit the misconduct report; and then opened a disciplinary hearing on the resubmitted misconduct report on May 12, 2022. *Id.* ¶¶ 13-14, 17-19. Nevil watched the video and determined that it showed plaintiff standing and moving up in the telephone line before deliberately forfeiting his place and walking to the end of the line to position himself closer to Sennert's cell, which he then entered "to unilaterally assault [Sennert]." *Id.* ¶ 22. Based on plaintiff's conduct as evidenced in the video, Johnson charged plaintiff with three rule violations: (1) Rule 2.05 (AIC Assault I), (2) Rule 4.01 (Disobedience of an Order I), and (3) Rule 4.40 (Unauthorized Area I). *Id.* ¶ 23 & Ex. 2 at 26.

On May 12, 2022, Nevil opened a disciplinary hearing regarding the altercation. *Id.* ¶ 19. Plaintiff was present for the disciplinary hearing and acknowledged understanding his rights in a hearing as well as receiving a copy of the Misconduct Report, Notice of Hearing, Notice of Inmate Rights in a Hearing, and Rules of Prohibited Conduct. *Id.* ¶ 32. During the hearing, Nevil heard testimony from plaintiff; reviewed Johnson's misconduct report; and reviewed the relevant documentary evidence, video footage, and mental health evaluation. *Id.* ¶ 33. Plaintiff ultimately denied the Rule 2.05 (AIC Assault I) and Rule 4.01 (Disobedience of an Order I) violations and admitted the Rule 4.40 (Unauthorized Area I) violation. *Id.* at Ex. 5 at 6:3-12 (referring to ECF numbering).

Nevil concluded that Sennert tried multiple times to force plaintiff, who was not authorized to be in Sennert's cell, out of the cell. *Id.* ¶ 34. When Sennert got plaintiff out of the cell, plaintiff "aggressively forced himself back in to assault Sennert." *Id.* Nevil "determined that Sennert's actions were measured and reasonable under the circumstances, and [] that Sennert was the victim of a unilateral assault perpetrated by [p]laintiff." *Id.* Thus, Nevil determined that plaintiff violated (1) Rule 2.05.03 by "commit[ing] a unilateral attack in a location or under circumstances which create a threat to the safety, security, or orderly operation of the facility"; (2) Rule 4.01 by "overly refus[ing] to promptly comply with

4

a valid court order"; and (3) Rule 4.40, "Unauthorized Area I." *Id.* ¶¶ 35-37. To impose sanctions, Nevil took into consideration the fact that, "[a]t the time of the hearing, [p]laintiff had [nine] major rule violations in the two years leading up to the case, as well as a [thirty]-day disciplinary segregation sanction and $200 fine from another case . . . that were suspended pending no major rule violations." *Id.* ¶ 38. Nevil "merged the sanctions and imposed the previously suspended sanctions[,]" and, as a result, "recommended 120 days disciplinary sanction, with credit for time served, plus the [thirty]-day disciplinary segregation sanction that was previously suspended[,]" as well as twenty-eight "days loss of privileges" and "that the previously suspended $200 fine be imposed." *Id.* ¶ 40.

Plaintiff sought administrative review from Nofziger. *Id.* ¶ 41. On July 11, 2022, Nofziger acknowledged the petition and determined that the case was conducted in accordance with ODOC's rules; the finding was based on a preponderance of the evidence; and the sanctions imposed were in accordance with the rules. *Id.* ¶ 42 & Ex. 2 at 47. The same day, Nevil briefly reopened the hearing to correct a typographical error but failed to inform the ODOC Central Trust that the hearing had been reopened for this limited reason; as a result, a second $200 fine was assessed against plaintiff. *Id.* ¶¶ 43, 47. On August 22 and 23, 2022, plaintiff sent AIC communication forms ("kytes") to the Hearings Office regarding the additional fine, and on August 24, Nevil sent a memo to plaintiff and the ODOC Central Trust "alerting them to the situation and asking that the second $200 fine be removed because the fine was assessed twice in error." *Id.* ¶¶ 46-47.

Plaintiff was moved to the disciplinary segregation unit ("DSU") following the altercation, on April 28, 2022. *See* Decl. of Jeff Carey Supp. Defs. Mot. for Summ. J. ("Carey Decl."), ECF [53], ¶¶ 5, 16 & Exs. 1 (copy of plaintiff's housing history as of April 24, 2023), 3 (copy of plaintiff's DSU Housing Log reflecting admission date of April 28, 2022). AICs in DSU are placed on an "Incentive Level based system" and enter DSU at "Incentive Level 2." *Id.* ¶¶ 7-8. All AICs—regardless of their incentive level— receive "basic State-issued hygiene products upon entering DSU." *Id.* ¶ 9. These basic items "are issued [in] a plastic tote with a lid" and include, among other items, "toilet paper, a comb, soap, and a toothbrush." *Id.* ¶ 10. AICs are not issued baking soda during their intake to DSU, however, staff issue additional

supplies twice per day using a supply cart that "is set up with approximately [two] dozen small cups of baking soda for brushing teeth, and [] more empty cups and a box of baking soda in case the officers need to issue more." *Id.* ¶ 11.  AICs may also "request additional soap when they shower, and [] may take the soap back to their cell afterwards." *Id.* ¶ 12.  There are also "exchange days" on which AICs may change out their State-issued toothbrushes. *Id.* ¶ 13.  Finally, once an AIC on DSU reaches an Incentive Level 3, they may purchase additional hygiene items from the canteen. *Id.* ¶ 14.

On May 4, 9, and 10, 2022, plaintiff refused to clean his cell in DSU, and as a result, plaintiff was moved to Incentive Level 1. *Id.* ¶ 17 & Ex. 3 at 2.  Plaintiff's incentive level was reviewed on May 24, 2022, however, he "remained at Incentive Level 1 because he had two extra sheets and [an] extra pillow case, which were not allowed." *Id.*  On June 5, 2022, plaintiff was raised to Incentive Level 2. *Id.* ¶ 18 & Ex. 3 at 2.  On June 30, 2022, plaintiff was caught passing contraband from his cell to another and was dropped back to Incentive Level 1. *Id.* ¶ 19 & Ex. 3 at 2.  On July 15, 2022, plaintiff moved to Incentive Level 2; on August 13, 2022, to Incentive Level 3, and on September 11, 2022, to Incentive Level 4. *Id.* ¶¶ 20-21 & Ex. 3 at 2-3.  Plaintiff was released from DSU on September 24, 2022. *Id.* ¶ 16 & Ex. 3 at 4.

a.    Access to Hygiene Products While in DSU

While in DSU, plaintiff submitted several prison grievances. *See* Carey Decl. ¶¶ 22-23 & Exs. 4, 5.  In a grievance dated July 11, 2022 (the "July 11 grievance"), plaintiff opined that he was being denied hygiene products. *Id.* ¶ 22 & Ex. 4 at 14; Sobotta Decl. ¶ 23 & Ex. 7 at 37.  The July 11 grievance was accepted on July 20, 2022.  Carey Decl. Ex. 4 at 13.  Carey responded to the July 11 grievance on October 18, 2022, informing plaintiff that he was "issued basic hygiene items while [] housed in [DSU]" and that pursuant to ODOC policy, plaintiff would be allowed approved canteen items, including certain personal property, once he reached Incentive Level 3. *Id.* at Ex. 4 at 11.  Plaintiff filed a first-level appeal of the July 11 grievance on October 19, 2022, and subsequently corrected that appeal pursuant to ODOC rules on December 2, 2022. *See id.* at Ex. 4 at 8-10.  In both the initial and corrected first-level appeal, plaintiff stated that "[a]fter [] asking for toothpaste for one hundred and nine days [he] had to use baking soda to brush [his] teeth[] [and had] no shampoo at all." *Id.* at Ex. 4 at 9-10.  Plaintiff further stated that he

never received basic hygiene items and that he was only ever issued baking soda. *Id.* Pedro responded to plaintiff's first-level appeal of the July 11 grievance on December 5, 2022, finding "that the EOCI staff performed their duties in accordance with ODOC rules, policies, and procedures." *Id.* at Ex. 4 at 6. Plaintiff filed a second-level appeal of the July 11 grievance on December 12, 2022, arguing that he should not be required to "earn" the use of hygiene products he has already purchased. *Id.* at Ex. 4 at 4-5. The second-level appeal further requested that the DSU rules be changed to allow AICs use of any hygiene products after thirty days' time in DSU, regardless of the AICs' incentive level. *Id.* at Ex. 4 at 4. On December 20, 2022, ODOC's institutions administrator responded to plaintiff's second-level appeal, concurring with Pedro's prior response and thereby "conclud[ing] the grievance review process for th[e] matter." *Id.* at Ex. 4 at 1, 15.

In additional grievances submitted on July 29 and August 1, 2022, plaintiff stated that he sent kytes to Carey and Pedro regarding his lack of access to soap, toothpaste, and lotion he purchased from the DSU canteen, but that he did not receive responses to these kytes or access to the requested hygiene products. *Id.* ¶ 23 & Ex. 5 at 17. These grievances were accepted on August 26, 2022. *Id.* at Ex. 5 at 15. Carey responded on October 11, 2022, explaining the DSU incentive level system and noting that he had twice already explained the same to plaintiff in person. *Id.* at Ex. 5 at 13. Plaintiff filed a first-level appeal on October 12, 2022, in which he opined that "[i]t is unethical and unprofessi[o]nal to allow an AIC to go 109 day's [*sic*] without toothpaste [and] only given [*sic*] baking soda" and that ODOC's policies and procedures conflict with applicable Oregon Administrative Rules ("OAR"). *Id.* at Ex. 5 at 12. Plaintiff filed another appeal on December 2, 2022, arguing again that the DSU incentive level program violates the OAR. *Id.* at Ex. 5 at 7. Pedro responded on December 22, 2022, finding again "that the EOCI staff performed their duties in accordance with the ODOC current rules, policies, and procedures" and noting that Pedro assigned a lieutenant to investigate the appeal and that the investigation resulted in a finding that DSU's incentive-based program should include verbiage for long term status in DSU; as such, he related that "[a]dditional verbiage for long term status in DSU will be added to fit the current rule." *Id.* at Ex. 5 at 4. Plaintiff filed a second-level grievance appeal on December 28, 2022, arguing that at the time of his

placement in DSU, the rules provided that any "long term inmate in [DSU] over 30 day's [*sic*] is allowed their approved canteen items" and that "[i]t is cruel and unethical to allow an [AIC] to go 109 day's [*sic*] without toothpaste and shampoo[.]"  *Id.* at Ex. 5 at 3.  On December 30, 2022, ODOC's institutions administrator responded to plaintiff's second-level appeal, concurring with Pedro's prior response and thereby "conclud[ing] the grievance review process for th[e] matter."  *Id.* at Ex. 4 at 15.

       b.       Dental Care Received While and After Being in DSU

       On June 13, 2022, plaintiff sent a kyte to dental.  The next day, plaintiff was scheduled to see a dentist employed at EOCI, Victor Gehling, D.M.D. ("Gehling").  Decl. of Victor Gehling, D.M.D., Supp. Defs. Mot. for Summ. J. ("Gehling Decl."), ECF [54], ¶ 9 & Ex. 2 at 14.  Gehling evaluated plaintiff in DSU on June 27, 2022, and noted that plaintiff did not have an infection but "needed rough stainless-steel crowns smoothed."  *Id.* ¶¶ 1, 10 & Ex. 2 at 26.  Plaintiff "was informed [that] dental would schedule an Intake Exam with x-rays to determine his dental needs."  *Id.* ¶ 10 & Ex. 2 at 26.  On July 18, 2022, plaintiff "was escorted to dental from [DSU] for his Intake Exam with x-rays."  *Id.* ¶ 11 & Ex. 2 at 26.  While there, another dentist smoothed one of plaintiff's rough crowns; informed plaintiff of his dental needs; and determined plaintiff's risk levels for caries and periodontal disease as, respectively, "C1 (low level of caries) and P2-3 (moderate level of Perio)."  *Id.* ¶¶ 11-12 & Ex. 2 at 20-24, 26.  Plaintiff did not mention tooth pain or an inability to sleep during this appointment, and the dentist "did not see any dental problems at that time which would cause severe pain."  *Id.* ¶ 16.

       On June 21, 2022, plaintiff sent another kyte to dental "asking if it would be wise and healthy to floss his teeth and asking if he was at risk for 'future health dental risk' if he did not floss his teeth."  *Id.* ¶ 13 & Ex. 2 at 9.  Puente-Gomez answered the kyte and informed plaintiff "that since he was not able to get floss in DSU, he should keep doing a good job at brushing and get back to flossing when he was out of [DSU]."  *Id.*  On June 25, 2022, plaintiff sent another kyte to dental "about pain in his tooth and having trouble getting to sleep and eating[,]" stating that the symptoms "w[ere] from using baking soda on his teeth for [three] months in DSU."  *Id.* ¶ 14 & Ex. 2 at 11.  Puente-Gomez answered the kyte and informed plaintiff that if he "did not want to continue using baking soda and did not have regular toothpaste, brushing

with warm water would keep his teeth clean[,]" and that plaintiff had an appointment scheduled with the dentist. *Id.* On August 20, 2022, plaintiff sent another kyte to dental. *Id.* ¶ 15 & Ex. 2 at 5. Puente-Gomez answered the kyte and informed plaintiff that he was scheduled for dental. *Id.*

Plaintiff received dental treatment on August 25, 2022, *id.* ¶ 17 & Ex. 2 at 26 (indicating plaintiff's receipt of a new stainless-steel crown and sodium fluoride varnish "for sensitivity"); was approved for nightguard on September 13, 2022, *id.* ¶ 18 & Ex. 2 at 18 (approving nightguard following identification of signs of Bruxism); and then received additional dental treatments on October 4, 7, and 10, 2022, *id.* ¶¶ 19-22 & Ex. 2 at 25 (indicating various treatments related to sensitivity, including application of sodium fluoride and duraflor). At plaintiff's October 10 treatment, plaintiff reported that the prior applications of sodium fluoride and duraflor had improved his sensitivity. *Id.* ¶ 23.

Though plaintiff submitted several grievances related to his ability to procure certain hygiene products while in DSU, plaintiff did not submit any medical grievances related to his dental health care or medical care for any skin conditions. *Id.* ¶ 28.

c.    Mental Health Care

Plaintiff filed one medical grievance while in DSU, on September 4, 2022 (the "September 4 grievance"), regarding his mental health. Sobotta Decl. ¶ 23 & Exs. 6, 7 at 76. In the September 4 grievance, plaintiff noted his schizophrenia diagnosis and alleged that his "mental illness ha[d] [] gotten worse' because he 'had been in [DSU] for 130 days.'" *Id.* ¶ 25 & Ex. 7 at 76. The September 4 grievance was accepted on October 18, 2022, and EOCI mental health professional Rhonda Smith ("Smith") responded to it on October 24, 2022. *Id.* ¶ 26 & Ex. 7 at 73-74. Smith's response noted that Smith and plaintiff met on October 24 and discussed the September 4 grievance, at which time Smith understood plaintiff to "believe that the issues have been resolved since [his] return to general population" and at which time plaintiff reported he believed the September 4 grievance to be resolved. *Id.* at Ex. 7 at 73. Plaintiff did not appeal the September 4 grievance response. *Id.* ¶ 27.

2.    *Plaintiff's Allegations*

Plaintiff argues that the altercation was a "mutual fight" that ultimately involved "no

'serious physical injury,' no weapon, no staff intervention, and no bod[il]y fluids[.]"  First Am. Compl., ECF [25], ¶ 23; Pl. Resp. to Defs. Mot. for Summ. J., ECF [60], ¶ 6.  Plaintiff argues that his write-up should therefore not have been for "Assault 1" and that the discipline he received was the result of defendants' abuse of authority and manipulation of the administrative process plaintiff received following the altercation. First Am. Compl. ¶ 23.  Plaintiff further alleges that he was denied access to various hygiene products while in DSU, in violation of ODOC policies and procedures, and that the lack of access resulted in plaintiff suffering dental problems, including cavities, a ruptured crown, and swollen gums, as well as rashes and other skin-related disorders.  *Id.* ¶ 22.  Plaintiff also alleges that his time in DSU caused him psychological decompensation.  *Id.*  Finally, plaintiff alleges that the disciplinary fines assessed against his trust account violated his Fourteenth Amendment due process rights.  *Id.* ¶ 24.  Plaintiff ultimately seeks declaratory and injunctive relief; compensatory, non-compensatory, and punitive damages; and any other relief as is equitable and just.  *Id.* ¶¶ A-F.

**B.    Applicable Policies**

Johnson charged plaintiff with three rule violations: Rules 2.05 (AIC Assault I), 4.01 (Disobedience of an Order I), and 4.40 (Unauthorized Area I).  Nevil Decl. ¶ 23 & Ex. 2 at 26.

Rule 2.05 concerns "AIC Assault I," which is defined as "a unilateral attack in a location or under circumstances that create a threat to the safety, security, or orderly operation of a facility."  OAR 291-105-0015(2)(d)(C).  AIC Assault I is a Level I rule violation on ODOC's Major Violation Grid (the "grid") and carries maximum sanctions of 120 days in DSU, twenty-eight days of loss of privileges, and a maximum $200 fine.  Nevil Decl. ¶ 25 & Exs. 1 at 43 (version of grid in effect as of the date of plaintiff's disciplinary hearing), 5 at 12:9-14 (referring to ECF numbering).  Rule 4.01 concerns "Disobedience of an Order I," which is defined as an AIC's "overt[] refus[al] to promptly or in a timely manner comply with a valid order, which creates a threat to the safety, security, or orderly operation of a facility."  OAR 291-105-0015(4)(a).  Disobedience of an Order I is a Level III rule violation on the grid and carries maximum sanctions of twenty-eight days in DSU, twenty-eight days of loss of privileges, and a maximum $75 fine.  Nevil Decl. ¶ 27 & Ex. 1 at 43.  Rule 4.40 concerns "Unauthorized Area I," which is defined as an AIC's

"fail[ure] to be present in any location designated by assignment, programmed activity, call out, or employee or non-employee service provider directive . . . that creates a threat to the safety, security, or orderly operation of a facility." OAR 291-105-0015(4)(o). Unauthorized Area I is a Level III rule violation on the grid and carries maximum sanctions of twenty-eight days in DSU, twenty-eight days of loss of privileges, and a maximum fine of $75. Nevil Decl. ¶ 29 & Ex. 1 at 43.

Upward deviations from the maximum sanctions identified in the grid are permitted when circumstances warrant. *Id.* ¶ 30. Any such deviation may not exceed fifty percent of the maximum sanction provided by the grid and must "be supported by written 'substantial reasons' outlining the mitigating or aggravating factors which support the deviation." OAR 291-105-0072(1).

## DISCUSSION

### A.    Defendants' Motion for Summary Judgment

Defendants argue that plaintiff's deliberate indifference to a serious medical need claim fails because plaintiff did not exhaust his administrative remedies. Defendants further argue that all of plaintiff's claims fail under section 1983 because (1) plaintiff has not established that defendants violated any of plaintiff's constitutional rights and (2) defendants are entitled to qualified immunity.

####     1.    *Administrative Exhaustion*

The Prison Litigation Reform Act ("PLRA") requires AICs to exhaust all administrative remedies before filing a lawsuit with respect to prison conditions, whether under section 1983 or any other federal law. 42 U.S.C. § 1997e(a) ("No action shall be brought . . . until . . . available remedies are exhausted."); *Albino v. Baca*, 747 F.3d 1162, 1166, 1171 (9th Cir. 2014) (noting that a remedy is "available" when it is "capable of use; at hand"); *see Porter v. Nussle*, 534 U.S. 516, 524, 531-32 (2002) (noting applicability of PLRA exhaustion requirement to all actions concerning prison conditions). The PLRA's exhaustion requirement serves several important purposes that "reduce the quantity and improve the quality of [AIC] suits[.]" *Porter*, 534 U.S. at 516. It gives corrections officials the opportunity to engage in corrective action that could obviate the need for litigation, as well as creates an administrative record useful to litigation. *Id.* at 517. "Proper" exhaustion is required, meaning that an AIC only satisfies the exhaustion

requirement by pursuing a grievance through the highest available level of appeal. *See Woodford v. Ngo*, 548 U.S. 81, 88, 93 (2006), *aff'd on remand*, 539 F.3d 1108 (9th Cir. 2008), *and superseded by statute on other grounds as stated in William Loveland Coll. v. Distance Educ. Accreditation Comm'n*, 347 F. Supp. 3d 1 (D.D.C. Sept. 28, 2018), *aff'd*, 788 Fed. App'x 5 (D.C. Cir. 2019); *Bennett v. King*, 293 F.3d 1096, 1098 (9th Cir. 2002) (citation omitted). A defendant is entitled to summary judgment based on an AIC's failure to exhaust administrative remedies when the "undisputed evidence viewed in the light most favorable to the [AIC] shows a failure to exhaust[.]" *Albino*, 747 F.3d at 1166. The court resolves factual questions related to exhaustion and should resolve any such issues "before reaching the merits of a[n] [AIC]'s claim." *Id.* at 1171 (citations omitted). Ultimately, dismissals for failure to exhaust are without prejudice. *McKinney v. Carey*, 311 F.3d 1198, 1200-01 (9th Cir. 2002).

ODOC's grievance system policies and procedures are governed by Chapter 291, Division 109 of the OAR and provide that where AICs cannot resolve a dispute informally, they may file a formal grievance. OAR 291-109-0100(3)(a)-(b). AICs may file grievances regarding, for example, "[m]isapplication of departmental policies, rules, or other directives; . . . [u]nprofessional actions of employees . . . ; [and] [i]nadequate medical or mental health treatment[.]" OAR 291-109-0100(3)(a)-(b); 291-109-0210(3)(a)-(c). An AIC "may not file more than one accepted grievance [] regarding a single incident or issue, regardless of incident date, unless substantial new information is available about the incident or issue." OAR 291-109-0210(2). "Grievances must be received by the institution grievance coordinator or designee within [fourteen] calendar days from the date of the incident or issue being grieved, unless the AIC can satisfactorily demonstrate why the grievance could not be timely filed." OAR 291-109-0205(1).

Once the grievance is accepted, staff provides a response to the AIC within thirty-five days, "unless further review is necessary[.]" OAR 291-109-0205(2). If the AIC is dissatisfied with the response to the submitted grievance, the AIC may appeal the denial in a two-level system of review. Sobotta Decl. ¶ 16; *see* OAR 291-109-0205(3)-(6). The first-level appeal "must be received by the institution grievance coordinator or designee within [fourteen] calendar days from the date the initial grievance response was

sent to the AIC unless the AIC can satisfactorily demonstrate why the [first-level] appeal could not be timely filed." OAR 291-109-0203(3). A response to the first-level appeal is sent to the AIC within thirty-five calendar days, "unless further review is necessary[.]" OAR 291-109-0205(4). If an AIC is dissatisfied with the response to the first-level grievance appeal, the AIC may submit a second-level appeal "within [fourteen] calendar days from the date the [first-level] appeal response was sent to the AIC unless the AIC can satisfactorily demonstrate why the [second-level] appeal could not be timely filed." OAR 291-109-0205(5).

If a grievance or grievance appeal is denied for not complying with the rules, it is returned to the AIC with an explanation. Sobotta Decl. ¶ 15. The AIC may resubmit their grievance or grievance appeal within fourteen calendar days from the date it was returned to the AIC but may not resubmit the grievance or grievance appeal more than twice. OAR 291-109-0225(2)(a)-(b). AICs are informed about ODOC's grievance review system when they first arrive at EOCI. Sobotta Decl. ¶¶ 9-10 & Exs. 3-5.

Plaintiff's deliberate indifference to a serious medical need claim fails because plaintiff did not exhaust his administrative remedies as to that claim. The evidence shows that plaintiff received information regarding the grievance system at intake and that he had ready access to the grievance system and instructions for its use through the AIC handbook as well as blank grievance and grievance appeal forms. Sobotta Decl. ¶¶ 9-11 & Exs. 3, 4, 5. The evidence also shows that the only grievance plaintiff submitted related to medical care was the September 4 grievance, in which plaintiff opined that DSU's conditions were negatively impacting his mental health and schizophrenia. *Id.* ¶¶ 23, 25 & Exs. 6, 7 at 76. Smith met with plaintiff before responding to the September 4 grievance, and plaintiff indicated to Smith that the September 4 grievance was resolved and did not appeal Smith's response to it. *Id.* ¶ 27 & Ex. 7 at 73. The evidence further shows that plaintiff did not file any grievances related to dental care or medical care for any skin conditions. *Id.* ¶ 28. As such, plaintiff did not exhaust available remedies related to his Eighth Amendment deliberate indifference to medical needs claim, and that claim is appropriately dismissed without prejudice.

2.     *Constitutional Violation and Qualified Immunity*

"In order to survive a motion for summary judgment on a § 1983 claim, the plaintiff must establish a genuine issue of material fact that the defendant (1) acted under the color of state law, and (2) deprived [the plaintiff] of a constitutional right." *Ewing v. City of Stockton*, 588 F.3d 1218, 1223 (9th Cir. 2009) (citing *Levine v. City of Alameda*, 525 F.3d 903, 905 (9th Cir. 2008)).  A defendant may still be immune from suit under the doctrine of qualified immunity if "the law governing th[e] right is [not] clearly established[,]" *i.e.*, if "it would [not] be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 199 (2001) (internal quotation marks and citation omitted), *remanded for further proceedings*, 262 F.3d 897 (9th Cir. 2001).  Defendants have not disputed plaintiff's allegation that defendants acted under the color of state law.  As such, the Court need only address the questions of whether plaintiff has established any constitutional violation and whether defendants are entitled to qualified immunity.

Though the Court has already determined that dismissal is appropriate as to plaintiff's Eighth Amendment deliberate indifference to medical needs claim for failure to exhaust, the Court nonetheless briefly addresses the substance of plaintiff's Eighth Amendment claim to offer guidance to the parties.  The Court also addresses plaintiff's Fourteenth Amendment claim.

a.     Constitutional Violation

To establish whether a defendant deprived the plaintiff of a constitutional right, a plaintiff must establish that the defendant "d[id] an affirmative act which result[ed] in the plaintiff being deprived of his federally protected rights[.]"  *Stevenson v. Koskey*, 877 F.2d 1435, 1439 (9th Cir. 1989)).  In other words, a defendant is not liable under section 1983 unless "there [is] a showing of personal participation in the alleged rights deprivation." *Murguia v. Langdon*, 61 F.4th 1096, 1106 (9th Cir. 2023), *cert. denied sub nom. Tulare v. Murguia*, 141 S. Ct. 553 (2024).  There is generally no *respondeat superior* liability under section 1983, *id.*, however, a plaintiff may state a claim for supervisory liability by alleging either that the defendant supervisor was personally involved in the constitutional deprivation or that a "sufficient causal connection" exists between the "supervisor's wrongful conduct and the constitutional violation," *Starr v.*

*Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (internal quotation marks omitted) (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)).  "A showing that a supervisor acted, or failed to act, in a manner that was deliberately indifferent to an inmate's Eighth Amendment rights is sufficient to demonstrate the involvement—and the liability—of that supervisor."  *Starr*, 652 F.3d at 1206-07.  In addition, "[a] supervisor can be liable in his individual capacity for . . . his acquiescence in the constitutional deprivation[] or for conduct that showed a reckless or callous indifference to the rights of others."  *Id.* at 1208 (internal quotation marks omitted) (quoting *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998)).  A sufficient causal connection exists, for example, if a defendant "implemented 'a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation.'"  *Mackinney v. Nielsen*, 69 F.3d 1002, 1008 (9th Cir. 1995) (quoting *Redman v. County of San Diego*, 942 F.2d 1435, 1446 (9th Cir. 1991)).

> i.    *Eighth Amendment*

The Eighth Amendment's prohibition of cruel and unusual punishment proscribes deliberate indifference to an AIC's serious medical need.  *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976) (citation omitted), *aff'd on remand*, 554 F.2d 653 (5th Cir. 1977) ("[T]he government[] [has an] obligation to provide medical care for those whom it is punishing by incarceration.").  To establish a deliberate indifference claim, an AIC must show (1) a serious medical need and (2) prison officials' deliberate indifference to that need.  *See, e.g.*, *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc), *aff'd on subsequent appeal*, 197 F.3d 367 (9th Cir. 1999).  The government may also act with deliberate indifference by imposing unconstitutional conditions of confinement; for example, this theory of deliberate indifference is at issue when the government fails to provide an AIC with the necessary "identifiable human need[s] such as food, warmth, [and] exercise," as well as personal safety.  *Wilson v. Seiter*, 501 U.S. 294, 304 (1991) (citations omitted), *remanded for recons. on other grounds*, 940 F.2d 664 (6th Cir. 1991); *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000) (citations omitted).  In a prior case this district dismissed a plaintiff's claims because they were "premised on [the] defendants' failure to provide [the AIC] with toothpaste free

of charge and [with] baking soda for personal hygiene purposes." *Roshone v. Peters*, 2:13-CV-854-PK, 2014 WL 4547031, at *1, 6 (D. Or. Sept. 12, 2014) (noting that "it is clear under the jurisprudence . . . that [the defendant] lacks any Eighth Amendment obligation either to provide [AICs] with toothpaste at no charge or [] baking soda for personal-hygiene purposes[,]" and reasoning in part that "dentists [] advised [the plaintiff] that tooth-brushing with water alone is hygienically adequate").

Plaintiff has not established an Eighth Amendment claim against any of the named defendants. Plaintiff alleges that each defendant named in the Eighth Amendment claim was "directly involved in acts [and] omissions alleged in th[e] complaint herein" and notes that each defendant is sued in both their individual and official capacities. Compl. ¶¶ 9 (Pedro), 11 (Gomez), 12 (Carey), 13 (Drake), 14 (Van Weichel). Plaintiff alleges that "[a]n AIC in long term DSU has the right after 30 day's [*sic*] to access toothpaste, shampoo, soap off the canteen[,] [and] deodorant[,]" and that defendants Pedro, Van Weichel, Drake, Gomez, and Carey "willfully denied plaintiff his hygien[e] products" and "as a result plaintiff suffered dental problems, cavities[,] a ruptured crown[,] [and] swollen gums[,]" as well as "rashes and other skin related disorders due to the unhyeinic [*sic*] conditions and deprivation of hygien[e][.]" *Id.* ¶¶ 20, 22; *see* Pl. Resp. to Defs. Mot. for Summ. J. ¶¶ 2, 8 (alleging that the "hygiene products[] that Van Weichel, Drake, Carey, [and] Pedro were giving [plaintiff] were not doing good to plaintiff's skin or teeth").

Plaintiff's Eighth Amendment claim fails because plaintiff has not established deliberate indifference under either a theory of deliberate indifference to a serious medical need or unconstitutional conditions of confinement. The evidence in the record shows that plaintiff was provided or given access to standard hygiene items for AICs on DSU in accordance with ODOC policy, including soap, a toothbrush, and baking soda. Carey Decl. ¶¶ 9-14 & Ex. 4 at 11. The evidence also shows that plaintiff received responses to his kytes regarding dental care, including being informed that the use of baking soda could impact tooth sensitivity and that brushing with warm water was adequate until release from DSU. Gehling Decl. ¶¶ 14, 23 & Ex. 2 at 11 (indicating that "[b]aking soda can cause teeth to become sensitive, but by discontinuing use of baking soda and using a desensitizing agent . . . , sensitivity can be improved"). The evidence in the record does not show that any of defendants provided medical care to plaintiff (as opposed

to responding to kytes, grievances, or grievance appeals) and does not establish that any of defendants were deliberately indifferent to a serious medical need or denied plaintiff identifiable human needs. Plaintiff has therefore not established that defendants violated his Eighth Amendment rights, and summary judgment in defendants' favor is appropriate as to this claim.

<em>ii.    Fourteenth Amendment</em>

Plaintiff alleges that Culp, Steward, Nevil, and Johnson violated plaintiff's Fourteenth Amendment due process rights when disciplinary fines were assessed against plaintiff's trust account. First Am. Compl. ¶ 24. Plaintiff asserts that over eighty-five percent of his money was confiscated; that neither plaintiff nor his mother, who put money into plaintiff's account, were provided notice that disciplinary fines could be assessed against the account; that defendants are not entitled to fine private money; and that plaintiff was fined twice. *Id.*; Pl. Resp. to Defs. Mot. for Summ. J. ¶ 11. It is not clear whether plaintiff's due process claim is a substantive or procedural one, and the Court therefore addresses each doctrine in turn.

(1)    Substantive Due Process

"The substantive component of the Due Process Clause forbids the government from depriving a person of life, liberty, or property in such a way that . . . interferes with rights implicit in the concept of ordered liberty." *Engquist v. Or. Dept. of Agriculture*, 478 F.3d 985, 996 (9th Cir. 2007), *aff'd*, 553 U.S. 591 (2008) (internal citation and quotation marks omitted). The doctrine protects an AIC's right to be free from arbitrary punishment, which is violated when an AIC is convicted of an offense for which there is "no shred of evidence of the [AIC]'s guilt." *Burnsworth v. Gunderson*, 179 F.3d 771, 774-75 (9th Cir. 1999). The "touchstone" of the inquiry "is protection of the individual against arbitrary action of government." *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974). In the prison disciplinary setting, "the requirements of due process are satisfied if some evidence supports the decision[.]" *Walpole v. Hill*, 472 U.S. 445, 455 (1985). The "some evidence" standard "does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of evidence." *Id.* Instead, it asks whether "there is any evidence in the record that could support the conclusion reached." *Id.* at 455-56.

Based on the evidence in the record, plaintiff cannot sustain a substantive due process claim premised on his prison disciplinary hearing. The evidence indicates that the disciplinary proceedings following the altercation were undertaken in accordance with ODOC rules. Nevil Decl. ¶ 5; *see generally* Nevil Decl. Before imposing sanctions, Nevil heard plaintiff's testimony and reviewed Johnson's misconduct report and the relevant documentary evidence, including video footage, photos, and plaintiff's mental health evaluation. *Id.* ¶ 33. Because there was—at minimum—"some evidence" that plaintiff violated the applicable ODOC rules, Nevil's decision did not offend plaintiff's substantive due process rights.

Likewise, Nofziger's refusal to vacate Nevil's decision or reopen plaintiff's disciplinary hearing was not unconstitutional. Under OAR 291-105-0100, "[t]he Inspector General . . . may, in the interest of justice, vacate all or part of a final disciplinary order or withdraw the order and direct that a disciplinary hearing be reopened for consideration of new evidence." This right belongs to the inspector general (not the AIC), and is permissive (not mandatory), *i.e.*, an inspector general who refuses to vacate or reopen a judgment against an AIC has not violated that AIC's due process rights. *See Woodroffe v. Oregon*, 2:12-cv-00124-SI, 2015 WL 2125908, at *8 (D. Or. May 6, 2015) (noting that the inspector general "did not violate a right of [the] [p]laintiff's by deciding not to vacate or reopen the adverse judgment"), *aff'd sub nom. Woodroffe v. Kulongoski*, 745 Fed. App'x 728 (9th Cir. 2018); *see also Brown v. Or. Dept. of Corrs.*, 751 F.3d 983, 987 (9th Cir. 2014) (citation omitted) (indicating that because the OAR outlining the procedures for administrative review of prison disciplinary hearings do not create a right that, if infringed, would constitute an "atypical and significant" condition of confinement, those OAR do not create a liberty interest to which due process protections attach). In sum, the evidence in the record shows that plaintiff's disciplinary hearing and resulting discipline did not violate plaintiff's substantive due process rights.

(2)    Procedural Due Process

The Fourteenth Amendment also prohibits the government from depriving an individual of a protected property or liberty interest without due process of law. *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976); *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 983 (9th Cir. 1998) (citations

omitted).  Here, plaintiff asserts that the fines assessed against his trust account were unconstitutional.  The parties do not appear to dispute that plaintiff had a property interest in the money in his trust account, and the question remaining before the Court is thus twofold: what process was due and whether plaintiff received that process.

The Supreme Court "consistently has held that some form of hearing is required before an individual is finally deprived of a property interest."  *Mathews*, 424 U.S. at 333 (collecting cases).  "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner."  *Id.* (citations omitted).  Ultimately, "[d]ue process is flexible and calls for such procedural protections as the particular situation demands."  *Id.* (citing *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).  "Once it is determined that due process applies, the question remains what process is due."  *Morrissey*, 408 U.S. at 481.

Under the applicable OAR, ODOC "may assess an [AIC]'s trust account for . . . [s]anctions resulting from the [AIC]'s disciplinary hearings . . . ."  OAR 291-158-0015(2)(a).  "An [AIC] who has DOC debt may be permitted to spend one half of the first $80 (up to $40) of funds deposited into the [AIC]'s general spending trust account for authorized expenditures during that calendar month."  OAR 291-158-0065(1)(a).  "Any additional deposits received by the [AIC] . . . during the calendar month shall be applied to the [AIC]'s debt until such indebtedness is satisfied."  OAR 291-158-0065(1)(b).  Furthermore, "[a]ny unused funds remaining in an [AIC]'s general spending trust account that were not transferred from the protected reserve account at the end of the last business day of the calendar month shall be applied to the [AIC]'s indebtedness."  OAR 291-158-0065(1)(c).

Based on the evidence in the record, plaintiff cannot sustain a procedural due process claim.  The evidence shows that plaintiff received a hearing, and therefore an opportunity to be heard, prior to the assessment of fines against his account.  The evidence also shows that the debt assessments made against plaintiff's trust account were in accordance with ODOC rules.  Decl. of Bob Culp Supp. Defs. Mot. for Summ. J. ("Culp Decl."), ECF [55], ¶¶ 4, 11-29.  Though a second $200 assessment was erroneously made against plaintiff's trust account, that error was rectified upon its discovery.  Nevil Decl. ¶¶ 42-47 & Ex. 2 at

50-51.  To the extent that plaintiff's claim is premised on the argument that *any* debt assessment is unconstitutional, that argument is without legal merit.  *See Halverson v. Skagit County*, 42 F.3d 1257, 1260-61 (9th Cir. 1994) (holding that the district court properly dismissed the plaintiff's procedural due process claim because the deductions made against the plaintiff "were effected by a valid act of the California legislature and the legislative process satisfies the requirements of procedural due process[,]" and that "general notice as provided by law is sufficient"), *as am. on denial of reh'g* (1995).  Plaintiff has not established that defendants violated his Fourteenth Amendment due process rights, and summary judgment in defendants' favor is thus appropriate as to this claim.

       b.       Qualified Immunity

With no claims remaining, the Court need not reach the qualified immunity issue, however, the Court nonetheless provides the following analysis as guidance to the parties.

Qualified immunity shields an official sued in their personal capacity from damages in a civil suit so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (internal quotation marks and citation omitted), *rev'd on remand on other grounds*, 726 Fed. App'x 357 (5th Cir. 2015) (per curium).  Qualified immunity provides immunity from liability as well as from suit.  *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), *rev'd in part on remand on other grounds sub nom. Forsyth v. Kleindienst*, 772 F.2d 894 (3d Cir. 1985).  Questions of qualified immunity should be resolved at the earliest possible stage of litigation.  *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (collecting cases), *rev'd on remand on other grounds sub nom. Bryant v. U.S. Treasury Dept., Secret Serv.*, 957 F.2d 729 (9th Cir. 1992).  The qualified immunity analysis can be distilled into two elements: (1) whether the alleged conduct would violate a constitutional or statutory right; and (2) whether the law clearly established, at the time of the conduct at issue, that the alleged conduct violated a constitutional or statutory right.  *Gordon v. County of Orange*, 6 F.4th 961, 967-68 (9th Cir. 2021) (citation omitted).  If either element is answered in the negative, then qualified immunity applies.  *Id.* at 968 (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

Defendants are entitled to qualified immunity.  As reasoned above, plaintiff has not

established that defendants violated any of his constitutional rights. As such, defendants are entitled to qualified immunity, and summary judgment in defendants' favor is also appropriate on this basis regarding all of plaintiff's claims.

**B.      Plaintiff's Motion for Order of Default**

Defendants timely answered plaintiff's complaint on July 24, 2023, ECF [15], and plaintiff's First Amended Complaint on November 13, 2023, ECF [26]. Defendants have not "failed to plead or otherwise defend," as must be shown under FRCP 55 prior to the Court's entry of any order of default. For this reason, plaintiff's motion for order of default is denied.

**CONCLUSION**

For the foregoing reasons, defendants' Motion for Summary Judgment, ECF [50], is GRANTED, and plaintiff's Motion to Default, ECF [61], is DENIED. This case is dismissed.

IT IS SO ORDERED.

DATED this 31st day of March, 2025.

Adrienne Nelson
United States District Judge